747 So.2d 164 (1999)
STATE of Louisiana, Appellee,
v.
Woodrow HAMILTON, Defendant-Appellant.
No. 99-523.
Court of Appeal of Louisiana, Third Circuit.
November 3, 1999.
*166 Robert Richard Bryant, Jr., Lake Charles, Mike K. Stratton, Lake Charles, for State.
Lawrence Charles Billeaud, Lafayette, for Woodrow Hamilton.
Before: DOUCET, C.J., PETERS, and SULLIVAN, JJ.
DOUCET, Chief Judge.
This is an appeal by Woodrow Hamilton of his conviction on two counts of first degree murder and his consecutive sentences of life imprisonment without benefit of probation, parole or suspension of sentence on each count.

FACTS:
The two shootings that led to the first degree murder charges against Woodrow "Woody" Hamilton occurred late in the evening of October 1, 1997. The Defendant was married to Rhonda Landry Hamilton, who had separated from him in July of 1997. Subsequently, on September 30, 1997, the Defendant filed a petition for divorce. Ms. Hamilton was served with the petition for divorce on October 1, 1997.
After the couple separated, Ms. Hamilton began to date Michael Trahan. Their relationship eventually became intimate, and on the night of October 1, 1997, Mr. Trahan accompanied Ms. Hamilton from a birthday party for one of her friends to her home on Sistrunk Road in Moss Bluff. The couple arrived between 8:30 p.m. and 9:00 p.m. Some time after 9:00 p.m., while the couple was in bed, they heard Ms. Hamilton's dogs barking. At trial, Mr. Trahan stated that he considered this unusual. About the same time, they heard scraping noises on the side of the house close to their bedroom. Mr. Trahan stated that he then heard someone beating at the front door, and that Ms. Hamilton got out of bed and looked out of the bedroom window and said, "It's Woody." Ms. Hamilton went to the front door and told the Defendant he was not supposed to be at her house and that he had to leave. The Defendant continued to beat on the front door, and plead with her to let him come inside to talk. During the time these events were unfolding, John Maggio and Clark Spikes, two neighbors, were sitting on the front porch next door.
When Ms. Hamilton realized the Defendant was at her home, she attempted to make a telephone call, but was unsuccessful. Within two weeks after the shooting, it was discovered that the telephone line to Ms. Hamilton's home had been kicked or knocked out. Mr. Lewis Dutel, Ms. Hamilton's landlord, tried to contact her at 7:23 p.m. on October 1, was unsuccessful and left a message with her answering machine. This indicated that telephone service was lost sometime between that time and the time Ms. Hamilton tried to call, after discovering the Defendant was outside *167 of her home. The State claimed that the scraping sounds heard by Mr. Trahan and Ms. Hamilton were the sounds of the Defendant kicking out the telephone connections after he arrived at her home.
Ms. Hamilton told Michael Trahan to stay in the bedroom while she went to the front door. Mr. Trahan heard what he thought was the front door being kicked in. Then the Defendant came inside. Ms. Hamilton screamed at the Defendant to leave. Mr. Trahan, who, by this time, had put on his blue jeans, went to the hallway and saw the Defendant walking down the hallway. The Defendant grabbed Mr. Trahan by his neck, saying, "What are you doing here? That's my wife. Who are you?" Then the Defendant shoved Mr. Trahan into the bedroom where the men struggled until Mr. Trahan broke free and hurried to the living room to get his boots and leave. The Defendant followed, twice grabbing Mr. Trahan by his hair, but Mr. Trahan was able to break free. As Mr. Trahan picked up his boots, the Defendant physically kicked him out of the front door and down the front steps of the house.
Next door, John Maggio and his friend, Clark Spikes, witnessed the commotion. The two men were sitting on the front porch enjoying the first cool weather of the season. They saw the Defendant arrive on his motorcycle, pound on the front door, walk around the house, and return to the front of the house to continue pounding on the door and demanding to be let inside. The men realized they were witnessing a domestic altercation, and Mr. Maggio went inside his house to call 911. Unfortunately, he was unable to get through. Mr. Maggio then returned outside in time to see Mr. Trahan come flying out of the house; he and Mr. Spikes watched as Mr. Trahan got into his truck and peeled out of Ms. Hamilton's driveway and pulled up to their house. Mr. Trahan asked the men to call the police because the Defendant was going to kill Ms. Hamilton. Before going in to make the 911 call, Mr. Maggio saw Mr. Trahan leave. The first 911 call was received at 9:40 p.m.
Mr. Maggio was inside his house talking to the 911 operator when both he and Mr. Spikes saw the Defendant come out of Ms. Hamilton's house dragging her limp, unconscious body down the front steps and across the yard to the Defendant's motorcycle. Mr. Maggio observed that it was eerie to hear the bump-bump-bump of her body hitting each step. Mr. Spikes stated that he then saw the Defendant return inside the house, dragging the limp form of Ms. Hamilton with him. Moments later, both men heard a gunshot. They later found Ms. Hamilton with a single bullet wound to the side of her head.
As the latter events were unfolding at the home of Ms. Hamilton, Michael Trahan was driving down the road away from the scene. As he passed a convenience store, he saw a marked sheriff's department patrol car in the parking lot and stopped to summon aid. Deputy Bill McIntosh, who was off-duty, offered to assist Mr. Trahan. Deputy McIntosh, who was standing next to the police car, was not wearing the usual sheriffs department uniform, but he was wearing a tan shirt with a visible sheriff's department logo on the chest. Mr. Trahan testified that the deputy instructed him to return to Ms. Hamilton's house and stop in front so that the deputy could identify the house. Deputy McIntosh further instructed Mr. Trahan not to get out, but to then drive down the street and wait inside his truck. Mr. Trahan did as he was instructed and moved to a position two houses down the street after the deputy got out of his marked patrol unit to go to the front door. Mr. Trahan heard the deputy identify himself and order someone to come outside; he then heard a gunshot. At that point, Mr. Trahan fled into the nearby woods until he felt it was safe to come out.
The two men next door to Ms. Hamilton's house saw the marked police unit drive up, and saw the deputy go up to the front door. Mr. Maggio was still on the *168 telephone with the 911 operator, relating what he and Mr. Spikes were seeing and hearing, when he heard the second gunshot. According to Mr. Maggio, Clark Spikes hollered, "He shot the cop."
The second gunshot was also heard by Mr. Nay Vickers, who lived on the other side of Ms. Hamilton. Mr. Vickers went outside and saw the Defendant standing over the body of the deputy on Ms. Hamilton's front porch. When the Defendant saw Mr. Vickers, he stepped over the deputy's body and walked toward his motorcycle. Mr. Vickers also made a call to 911 and during his call heard the Defendant start his Harley-Davidson motorcycle and ride away from the scene. Mr. Vickers, who performed routine maintenance on the rental houses on the street, later discovered that the telephone lines to Ms. Hamilton's home had been physically disconnected.
Other deputies were responding to the calls when they confronted the Defendant leaving the scene. The Defendant led them on a high speed chase from Ms. Hamilton's residence to his home in Moss Bluff. At his home, the Defendant went inside and armed himself with an AK-47 rifle. He shot one deputy, was injured himself, and then surrendered. The police found the 9-mm pistol used to shoot Ms. Hamilton and Deputy McIntosh inside the Defendant's home.
The jury convicted the Defendant of two counts of first degree murder, but it could not reach a unanimous verdict on the penalties. Thus, the Defendant was sentenced to life imprisonment without benefit of probation, parole or suspension of sentence. The trial judge ordered the sentences to be served consecutively.

ERRORS PATENT:
In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by the court for errors patent on the face of the record. We find no patent errors.

ASSIGNMENT OF ERROR NO. 3:
Although the Defendant has assigned the alleged insufficiency of the evidence to support the first degree murder convictions as his third error, we will address it first. The Defendant admits he shot and killed Ms. Hamilton and Deputy Bill McIntosh. However, the Defendant contends that he is guilty of manslaughter rather than first degree murder.

MANSLAUGHTER
Manslaughter is a homicide which would be either first or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of self-control and cool reflection. La.R.S. 14:31(A)(1). "Sudden passion" and "heat of blood" are not elements of the offense of manslaughte; rather, they are mitigating factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide is committed without them. State v. Sanders, 93-0001 (La.11/30/94); 648 So.2d 1272, cert. denied, 517 U.S. 1246, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996). This court must determine if the circumstances indicate the crime was actually manslaughter.
The State does not bear the burden of proving the absence of the mitigating factors of "sudden passion" and "heat of blood." To be entitled to a verdict of manslaughter a defendant must establish by a preponderance of the evidence that he acted in a "sudden passion" or "heat of blood."
In reviewing the claim, this court must determine if a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found the mitigating factors were not established by a preponderance of the evidence. State v. Huls, 95-0541 (La.App. 1 Cir. 5/29/96); 676 So.2d 160, writ denied, 96-1734 (La.1/6/97); 685 So.2d 126.
*169 In an effort to establish that he shot his estranged wife and Deputy McIntosh in sudden passion or heat of blood, the defense emphasized that the Defendant found his wife, partially naked, having just engaged in sexual intercourse with her nineteen-year-old boyfriend. According to the Defendant, this was the provocation for the shootings and his actions after the shootings.
The State countered this theory by arguing that the Defendant created his alleged provocation. The Defendant went, uninvited, to Ms. Hamilton's home late in the evening where he severed the telephone line leading to the home, apparently to prevent Ms. Hamilton from calling the police. There was no evidence that the Defendant observed his estranged wife engage in sexual intercourse with her boyfriend. Although there was no evidence the Defendant kicked in the front door, he forcibly came inside the house while Ms. Hamilton was yelling for him to leave and he attacked Michael Trahan. Ironically, the Defendant was telling Mr. Trahan that Ms. Hamilton was his wife, but he had just had divorce papers served upon her earlier that same day. After beating his wife unconscious, the Defendant dragged her limp body out of the house to his motorcycle, where he retrieved his 9-mm pistol. He then dragged the unconscious victim back inside the house and shot her in the head. Within minutes, Deputy McIntosh arrived, got out of his marked unit, walked to the front door, identified himself, and told the Defendant to come outside. At that point the Defendant immediately shot the deputy in the face. The Defendant's flight from the police and his later gun battle with other deputies clearly established his guilty knowledge. The State argued the Defendant's conduct after shooting his estranged wife was circumstantial evidence of his specific intent and lack of sudden passion or heat of blood.
The jury's guilty verdict demonstrates they concluded that the Defendant had failed to adduce proof to establish, by a preponderance of the evidence, sufficient provocation to deprive an average person of self-control and cool reflection. See State v. Corley, 97-235 (La.App. 3 Cir. 10/8/97); 703 So.2d 653, writ denied, 97-2845 (La.3/13/98); 712 So.2d 875. Further this court has ruled that the provocation necessary to establish manslaughter must immediately precede the murder. Id. Certainly in the case of the shooting of Deputy McIntosh, there was no evidence presented that the murder was immediately caused by provocation.
The jury's verdict may also reflect that they also concluded there was no provocation for the shooting of Ms. Hamilton. The acts of the Defendant leading up to the shooting of Ms. Hamilton establish that the Defendant may have planned to commit a criminal act when he forcibly entered her house. See generally, Sanders, 93-0001; 648 So.2d 1272; and Huls, 95-0541; 676 So.2d 160. The absence of any evidence of premeditation or a plan does not lead "to the inescapable conclusion that the defendant acted on the spur of the moment out of extreme provocation[,]" i.e., in sudden passion or heat of blood. State v. Bourque, 93-594, p. 7 (La. App 3 Cir. 2/16/94); 636 So.2d 254 at 260, writ denied, 94-1839 (La.1/6/95); 648 So.2d 920.
Neither the Defendant seeing his estranged wife with a boyfriend, Sanders, 648 So.2d 1272, nor disputes between spouses over their impending divorce or over-due money payments, Huls, 676 So.2d 160, are sufficient provocation to reduce first degree murder to manslaughter.
The evidence supports the verdict of guilty of two counts of first degree murder and establishes that the Defendant failed to present evidence sufficient to mitigate these verdicts to the lesser crime of manslaughter. Therefore, we reject this assignment of error.

ASSIGNMENT OF ERROR NO. 1:
By his first assignment of error, the Defendant contends that the State introduced *170 unduly prejudicial evidence of other crimes. The Defendant has divided his claim between the argument concerning his prior acts of emotional and physical abuse of the first murder victim, his estranged wife, Rhonda Landry Hamilton, and his flight, high-speed chase, gun battle, and surrender occurring immediately after the two murders.
In connection with the Defendant's first assignment of error, we first address the "prejudice" necessary to exclude relevant other crimes evidence.
Any inculpatory evidence is "prejudicial" to a defendant, especially when it is "probative" to a high degree. The Louisiana Supreme Court in State v. Germain, 433 So.2d 110 (La.1983), said that "prejudicial" when used in the context of limiting the introduction of other crimes evidence, means "only when it is unduly and unfairly prejudicial." Germain, 433 So.2d at 118. In the later case of State v. Felo, 454 So.2d 1150 (La.App. 4 Cir.1984), writ denied, 488 So.2d 686 (La.1986), a reviewing court again faced an argument that other crimes evidence was prejudicial and thus inadmissible. In rejecting this claim, the court differentiated between the types of prejudicial evidence, and it gave the proper definition of "prejudicial" as used in the weighing of probative value of evidence versus prejudicial impact.
We note, parenthetically, that by "prejudicial", it cannot be meant simply "damaging"; if that were true, then any evidence which is probative would be "prejudicial". But it is only unfairly prejudicial evidence that cannot be admitted, State v. Germain, supra, and as one court has noted, "unfair prejudice results from an aspect of the evidence other than its tendency to make the existence of a material fact more or less probable, e.g., that aspect of the evidence which makes conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged." United States v. Bailleaux, 685 F.2d 1105 (9 Cir.1982).
Felo, 454 So.2d at 1156-57, n. 1.
Inculpatory evidence is probative of an incriminating fact, circumstance, or involvement which tends to either establish guilt or from which guilt may be inferred. Inculpatory evidence, by its nature, is prejudicial to a defendant accused of a crime. Unfairly prejudicial evidence makes a conviction more likely because it inflames the emotions of the jury or affects the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged. La.Code Evid. art. 403 permits the exclusion of relevant evidence, but only if the danger of unfair prejudice substantially outweighs its probative value.
Relevant evidence of other crimes or misconduct of an accused will always be inculpatory and thus prejudicial. It is only unduly prejudicial evidence of other crimes which inflames the jury's emotions or otherwise causes them to convict the Defendant for reasons other than his actual guilt which should be excluded. Having delineated the type of prejudicial evidence subject to exclusion, we now examine the contested evidence presented at trial to see if it should have been excluded.

DEFENDANT'S PRIOR PHYSICAL AND EMOTIONAL ABUSE OF WIFE
Regarding the evidence of the Defendant's prior acts of physical and emotional abuse of Ms. Hamilton, the Defendant does nothing more than claim that this evidence was so prejudicial that it confused and inflamed the jury.
Prior to trial, the State gave notice of its intent to introduce evidence about the Defendant's prior abuse of his wife, and at the conclusion of a pretrial hearing, the trial judge found the evidence admissible. The Defendant does not deny that he committed the prior acts of abuse against his wife. The Defendant does not deny that *171 this evidence refutes his claim that he acted in sudden passion or heat of blood when he killed the two victims. The Defendant simply claims the evidence's probative value is outweighed by its prejudicial impact.
In the present case, the Defendant's murder of his estranged wife occurred after he had forcibly entered her home in violation of a court-issued protective order and physically beaten her until she was unconscious, a classic example of domestic violence. There would hardly be any evidence more "prejudicial" than evidence of the Defendant's prior acts of physical and emotional abuse of his wife. In Germain, 433 So.2d 110, the supreme court explained that "prejudicial," when used in the context of limiting the introduction of other crimes evidence, means "only when it is unduly and unfairly prejudicial." Id., at 118. In Germain, the defendant, charged with murdering his stepdaughter by beating her, claimed that evidence of his prior beatings of the victim several weeks before her death was "prejudicial" and thereby inadmissible; however, the supreme court ruled that this evidence was not unduly and unfairly prejudicial. The two murders giving rise to the charges against the Defendant arose out of an act of domestic violence. The Defendant's prior abuse of his estranged wife, the first murder victim in this case, was undoubtedly prejudicial; it showed a pattern of abuse and rebutted the claim that Defendant acted in sudden passion or heat of blood. However, it was not unduly and unfairly prejudicial in light of its relevancy. We reject this argument.

DEFENDANT'S FLIGHT FROM THE MURDER SCENE
The Defendant claims that the evidence of what occurred after he shot the two victims was prejudicial and not relevant to the two murder charges. The Defendant did not deny he shot and killed his estranged wife and the deputy; his defense to the first degree murder charges was that he was guilty of manslaughter because he committed the murders in sudden passion or heat of blood. As a result of his admission, the Defendant argued that the evidence of his flight, gun battle with other deputies, and surrender was not relevant to the issue of his intent to kill more than one person, his intent to kill a peace officer performing his duty, or whether he committed the two murders while committing an aggravated burglary. The Defendant contends that the evidence about his flight from the murder scene was unduly prejudicial because it confused the jury and misled them about the Defendant's claim that he killed his wife and the deputy in sudden passion or heat of blood.
The State contends that the evidence about the Defendant fleeing the murder scene, leading other deputies on a high-speed chase, barricading himself in his house, and shooting another deputy before he surrendered was part of the res gestae of the two murders since it was all part of the continuous chain of events beginning with the murder of the Defendant's wife and ending twenty-eight minutes later with the Defendant's surrender. The State further argues that the Defendant could not by stipulation or admission deprive the prosecution of its right to present all of its case against him. Finally, the State notes that the evidence about the events immediately after the murders was necessary to prove that the murder weapon used to kill the two victims was in the Defendant's possession at the time of his surrender.
The evidence presented at trial established a continuous, uninterrupted chain of events over a short period of time. When the Defendant went to his estranged wife's home, in violation of a court-issued protective order, he disabled the telephone line before he forced his way into the home. The Defendant then attacked his estranged wife's boyfriend, and after the boyfriend escaped, the Defendant beat and fatally shot his estranged wife. During this time, neighbors saw and heard what appeared to be a domestic disturbance and *172 made the first 911 call for the police. Within minutes, Deputy McIntosh arrived at the home, knocked on the door, and identified himself as a police officer. At that point, the Defendant shot the deputy in the face. The Defendant immediately stepped over the body of Deputy McIntosh, got on his motorcycle and left the scene. Other deputies responding to the 911 calls from neighbors confronted the Defendant on the road, and the Defendant led them on a high-speed chase that ended at his home. At his home, the Defendant engaged in a gun battle with the deputies. He shot one deputy before he was wounded and ultimately surrendered. As counsel for the Defendant notes in his brief, twenty-eight minutes elapsed from the time the first 911 call was made until the time the Defendant surrendered.
Other than citing statutory provisions governing relevancy and other crimes evidence, the Defendant cites no cases to support his claim that the events occurring within twenty minutes of the first two murders were irrelevant, and that whatever probative value arose from the evidence was far outweighed by the prejudicial impact of the evidence.
However, there are numerous cases that have held that such evidence is admissible.
Evidence of flight, concealment, and attempt to avoid apprehension is relevant. It indicates consciousness of guilt and, therefore, is one of the circumstances from which the jury may infer guilt. This rule applies notwithstanding that the evidence may disclose another crime. State v. Brown, La., 322 So.2d 211 (1975); State v. Graves, La., 301 So.2d 864 (1974); State v. Nelson, 261 La. 153, 259 So.2d 46 (1972). See also State v. Lane, La., 292 So.2d 711 (1974); State v. Johnson, 249 La. 950, 192 So.2d 135 (1966); State v. Goins, 232 La. 238, 94 So.2d 244 (1957); 29 Am.Jur.2d, Evidence, §§ 280 et seq., pp. 329 et seq. A court may admit a wide range of evidence to prove flight, concealment, and attempt to avoid apprehension. State v. Nelson, supra.
State v. Davies, 350 So.2d 586, 588 (La. 1977).
In Huls, 95-0541; 676 So.2d 160, the court found that the ex-husband's activities after he murdered his ex-wife, such as concealing her body, asking his girlfriend to lie about his whereabouts, borrowing the murder weapon, disposing of it and returning another gun to its owner, were consistent with a finding of specific intent to kill and guilty knowledge.
Flight from police officers is relevant even when it occurs many days after the crime. See State v. Bordenave, 95-2328 (La.4/26/96); 678 So.2d 19. Additionally, in State v. Morris, 521 So.2d 1214 (La.App. 2 Cir.), writ denied, 530 So.2d 80 (La.1988), the courts permitted the prosecution to introduce the fact that the defendant was discovered by the police hiding under insulation in an attic ten days after he committed the charged offense. In the present case, there was no lapse of days between the commission of the murders and the Defendant's flight. We find the Defendant's flight relevant to his consciousness of guilt, particularly for shooting the deputy.
The State proved that the gun used to kill the two victims was found in the Defendant's possession immediately after his surrender. The Defendant does not address the fact that the evidence of flight proved that no intervening circumstances arose that could have led to any other explanation for the Defendant's possession of the murder weapon.
Finally, the Defendant's actions immediately after the murders were part of an uninterrupted chain of events which constituted such an integral part of the murders that the State could not have accurately presented its case without reference to it. State v. Brewington, 601 So.2d 656 (La. 1992). See also State v. Wilson, 96-46 (La.App. 3 Cir. 5/8/96); 677 So.2d 471, writ denied, 96-1893 (La.8/27/97); 699 So.2d 49, *173 wherein the court ruled that testimony about a rapist's attempts to "cover up" the rape related to conduct that constituted an integral part of the act or transaction that was the subject of the trial, and it explained why the State had no physical forensic evidence of the rape to present to the jury.
Based upon the cited jurisprudence, we find the evidence about the Defendant's flight after the murders was relevant and thus, admissible. The probative value of this evidence outweighed any prejudicial impact. The evidence did not inflame the emotions of the jury, nor was it confusing or misleading on the issue of the Defendant's claim he acted in sudden passion or heat of blood when he shot both victims. Therefore, the trial court did not err in admitting this evidence.
Accordingly, this assignment of error is without merit and is rejected.

ASSIGNMENT OF ERROR NO. 2:
The Defendant's second assignment of error concerns the introduction of telephone records of his estranged wife and his own beeper records. The Defendant contends first that the State failed to comply with the discovery requirements of La. Code Crim.P. art. 718. Second, the Defendant makes a vague allegation that the beeper records belong to him and that the State violated his right to privacy by obtaining them without his consent or a court order.
After the State rested its case-in-chief, the Defendant presented his case which included a claim that the victim had been calling him the day before and the day of the shootings. Patricia Dawn Hamilton, the Defendant's sister-in-law, went to the Defendant's home several days after his arrest and heard his beeper signaling that he had been paged. Since she did not know how to work a beeper, she asked her daughter Dawn Hamilton to check the pages. Dawn Hamilton testified that there were five or six pages for the Defendant, but she only recognized the telephone number of Ms. Hamilton. According to Dawn Hamilton, the Defendant's estranged wife paged him once on September 30, 1997, and once on October 1, 1997. Ms. Hamilton could not recall from whom the other pages emanated, and she and her mother gave the beeper to the Defendant's private attorney.
At the beginning of the State's case-in-rebuttal, the prosecutors gave the defense attorneys copies of the October 1, 1997, telephone records for Ms. Hamilton and the beeper record of the Defendant. These records showed that Ms. Hamilton did not page the Defendant from her home telephone number on October 1, 1997. Counsel for the Defendant objected on two grounds: first, the records covered only October 1, 1997, and no days before the shooting; and second, the State had not previously turned these records over during discovery. The trial judge issued an instanter subpoena for the telephone records and beeper records for the days before October 1, 1997. The trial judge ruled that since the evidence was rebuttal evidence that the State had not intended to use in its case-in-chief, and which it decided to use only after the Defendant had introduced the testimony of Mrs. Hamilton and her daughter, the State did not have to disclose it during pretrial discovery. Accordingly, the trial judge then denied the Defendant's motion for mistrial.
On appeal, the Defendant first claims that the State violated its duty to disclose evidence pursuant to La.Code Crim.P. art. 718. Article 718 requires the district attorney to authorize the defendant to inspect and copy any documents material to the case that are in the control or custody of the district attorney and that are favorable to the defendant and which are material and relevant to the issue of guilt or punishment, or are intended for use by the state as evidence at the trial, or were obtained from or belong to the defendant. In the present case, the State argued that it did not intend to use the telephone and beeper records until the *174 Defendant made it relevant as rebuttal evidence. In State v. Amedee, 408 So.2d 1259 (La.1982), the Louisiana Supreme Court squarely addressed this identical issue. The supreme court ruled that at the time of pretrial discovery, the District Attorney did not intend to use some test results at trial, and not until the defense presented its case did the test results become relevant, thereby justifying the District Attorney's use of this evidence on rebuttal. Thus, the rebuttal evidence did not have to be excluded as a sanction for failure to comply with pretrial discovery since the evidence at issue was not subject to pretrial discovery. See also, State v. Dugas, 96-49 (La.App. 3 Cir. 10/9/96); 683 So.2d 1253, writ denied, 96-2652 (La.4/4/97); 692 So.2d 417.
We find the holding in Amedee squarely on point and applicable to this case. Thus, we hold the trial judge did not err in finding no violation of the State's duty to disclose the questioned evidence during pretrial discovery.
The Defendant also argues another ground for disclosure of evidence in pretrial discovery by alleging that the beeper records belonged to him. However, he cites no authority for this allegation other than saying that "obviously" they belonged to him. In State v. Savage, 575 So.2d 478 (La.App. 3 Cir.), writ denied, 586 So.2d 556 (La.1991), Mr. Kelly Adams, a security manager for Bell South Telephone Company, who also testified in the present case, testified that telephone bills are made and kept in the course of regularly conducted business activity, and it is the telephone company's regular practice to keep and maintain these records. Thus, the Defendant has failed to prove that the records of the telephone numbers from which the pages to his beeper were made belonged to him and not to the telephone company.
The second argument of the Defendant was not presented at trial. However, we chose to address it in the interest of justice, and of judicial economy. See Dugas, 96-49; 683 So.2d 1253. The Defendant argues on appeal:
Second, the beeper records[1] were obtained regarding the beeper of Woodrow Hamilton. If these are records regarding the use of the defendant's beeper, then obviously they belong to the defendant. Are there not rights of privacy regarding Federal Communications Information [sic]. The defendant was never requested to sign, nor did he sign a waiver allowing the State to obtain copies of these records. Additionally, the above captioned record is void of any "public record" subpoena establishing that an appropriate Magistrate or District Judge authorized the seizure of the defendant's private records.
It appears from the language used, that the Defendant considers the "seizure" of his private records an unconstitutional violation of his right to privacy. Normally such a claim would be raised by a motion to suppress, La.Code Crim.P. art. 703, but since the evidence did not become relevant until after the Defendant's case-in-chief, the Defendant had no opportunity to seek suppression of this evidence. Even if the Defendant had filed a motion to suppress this evidence, we find it would have been rejected. In State v. Niel, 93-1510 (La. App. 3 Cir. 5/4/94); 640 So.2d 588, writ denied, 94-1454 (La.3/24/95); 651 So.2d 286, denial of post-conviction relief affirmed, 95-1042 (La.App. 3 Cir. 3/27/96); 671 So.2d 1111, writ denied, 96-1217 (La.6/20/97); 695 So.2d 1346, a defendant also argued that his record of telephone usage, obtained by the state from the telephone *175 company, was unconstitutionally seized.
In his Motion to Suppress, defendant alleged that efforts to obtain records from UPS, South Central Bell Telephone Company, and Central Louisiana Electric Company (CLECO) violated his right to privacy. On appeal, defendant emphasized violation of his right to privacy in regard to the UPS records. Gigante [a federal investigator] testified at the hearing that DEA headquarters in Washington, D.C. subpoenaed UPS and obtained those records. (Subpoenas were also issued to South Central Bell and CLECO). Defendant has failed to show that these records are not public records or that he otherwise had a reasonable expectation of privacy in these records. We find no merit to this argument.
Id., at 594.
The present Defendant, just as the defendant in Niel, has failed to show he had any reasonable expectation of privacy in the records kept by the telephone company or that the State did not properly obtain the records by use of subpoena.
This assignment of error is without merit and is also rejected.

ASSIGNMENT OF ERROR NO. 4:
The Defendant's final assignment of error is that the trial court erred in ordering the two mandatory sentences for first degree murder be served consecutively. Defendant argues the murders were part of a single course of conduct and, pursuant to La.Code Crim.P. art. 883, they should be served concurrently.
La.Code Crim.P. art. 883 provides in part (emphasis added) that "[i]f a defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively." In the present case, the trial judge noted at sentencing that all the jurors believed that the Defendant deserved to die for what he did but they could not agree on why. She also noted the Defendant had wrought great devastation on a number people, including "... the McIntosh family, the Landry family, and your own family." Further, she remarked that while she was sure the Defendant would carry the guilt of what he had done to his own family, she was not convinced that he really cared about other families. The trial judge further noted that she believed there was a sufficient break in the series of events that the two murders did not constitute a continuous series of events.
Upon imposition of the two consecutive sentences, counsel for the Defendant objected and later filed a Motion to Reconsider which was denied December 3, 1998.
As the State points out in its appellate brief, concurrent sentences are not mandatory when the crimes arise out of the same act or transaction. In State v. Bibb, 626 So.2d 913 (La.App. 5 Cir.1993), writ denied, 93-3127 (La.9/16/94); 642 So.2d 188, a father was convicted of slashing to death his two children, ages two and five years old; their murders occurred within minutes of each other. As in the present case, the jury could not agree on a verdict and the defendant was subject to two terms of life imprisonment. The trial court ordered consecutive service of these two sentences, and the defendant appealed claiming it was excessive. In rejecting this claim, the court noted:
Herein, the two murders, though occurring close in time and place, are separate and distinct acts that justify consecutive sentences. Further, even assuming that the murders were close enough in time and place to be considered "same act" crimes which arise from a single course of conduct, we find that the trial court did not err in imposing consecutive sentences. Article 883 permits the court to impose consecutive sentences if the court "expressly directs" such sentences. State v. Nelson, *176 467 So.2d 1159, 1161 (La.App. 2 Cir.1985). Further, in his reasons for sentencing, the trial judge noted that these were "the most heinous crime [sic] I've ever witnessed in my life."
Id., at 940.
In State v. Dennard, 482 So.2d 1067 (La.App. 3 Cir.1986), consecutive service of two second degree murder sentences was not considered excessive even though the defendant had killed the two victims within moments of each other during a brief struggle. In Dennard, the defendant and his girlfriend killed her mother and grandmother, while they were sleeping, in order to prevent them from trying to stop the sixteen-year-old girl from running away with the nineteen-year-old defendant. See also, State v. Norman, 482 So.2d 1069 (La.App. 3 Cir.), writ denied, 487 So.2d 436 (La.1986). (Codefendant, girlfriend in Dennard, sentenced to consecutive service of manslaughter sentences for her part in the two murders.) More recently, in State v. Pilcher, 27,085 (La.App. 2 Cir. 5/10/95); 655 So.2d 636, writ denied, 95-1481 (La.11/13/95); 662 So.2d 466, the court upheld consecutive sentences for second degree murder for a defendant who shot a mother and her eleven-year-old son within a few minutes of each other.
We note that under some circumstances, consecutive life sentences have been upheld as not excessive. State v. Jett, 419 So.2d 844 (La.1982); State v. Williams, 445 So.2d 1264 (La.App. 3 Cir.1984), writ denied 449 So.2d 1346 (La.1984); State v. Dennard, 482 So.2d 1067 (La. App. 3 Cir.1986); State v. Barker, 628 So.2d 168 (La.App. 2 Cir.1993), writ denied 93-3194 (La.3/25/94), 635 So.2d 236. In light of the unusually heinous nature of these offenses, the trial court's finding that concurrent sentences would deprecate the seriousness of the killings, and that the sentences should be imposed consecutively is correct and will not be altered.
Id., at p. 15; 644, n. 5.
Our review of the record convinces us that the trial judge set forth sufficient reasons for ordering consecutive service of the two life sentences. There was absolutely no justification for the Defendant's murder of either his estranged wife or Deputy McIntosh. The Defendant armed himself and went to his estranged wife's home in violation of a protective order issued by the court, disabled her telephone line to prevent her from calling for help and forced his way into her home where he attacked her boyfriend and beat her into unconsciousness. He then dragged her out to his motorcycle (where he retrieved the murder weapon) and then back into the house where he ultimately shot her to death. The Defendant then, without provocation, shot Deputy McIntosh in the face as the police officer identified himself and tried to talk the Defendant out of the house. Considering the circumstances of these murders, we do not find consecutive service of the mandatory life sentences excessive.
Therefore, we also find this assignment of error without merit.

CONCLUSION:
Accordingly, for the reasons stated above, the convictions and sentences of the Defendant are affirmed.
AFFIRMED.
NOTES
[1] The Defendant was unable to obtain the beeper records for the days before October 1, 1997, because they were no longer available. The telephone company purged its records in December of 1997. Although the family of the Defendant had given his first retained counsel the beeper three or four days after they found it, no one had ever requested any records of who paged the Defendant and how often.