839 So.2d 1112 (2003)
STATE of Louisiana
v.
Cleveland WRIGHT, Jr.
No. 02-1268.
Court of Appeal of Louisiana, Third Circuit.
March 5, 2003.
*1113 J. Eddie Knoll, District Attorney, David Lafargue, 1st Assistant District Attorney, Marksville, LA, for State/Appellee, State of Louisiana.
Edward K. Bauman, Louisiana Appellate Project, Lake Charles, LA, for Defendant/Appellant, Cleveland Wright, Jr.
Court composed of SYLVIA R. COOKS, BILLIE COLOMBARO WOODARD, and BILLY HOWARD EZELL, Judges.
WOODARD, Judge.
The Defendant, Mr. Cleveland Wright, Jr., was arrested for the murder of Rosalind Greenhouse. A jury convicted him of second degree murder for which he was sentenced to life imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence. He challenges his conviction. We affirm.

* * *
In April of 1998, Rosalind Greenhouse, a seventeen-year-old female, was reported missing. Two years later, human remains found under a house were believed to be hers. DNA testing supported this assumption, although it was not conclusive. Rosalind was last seen entering an apartment where Mr. Wright resided. It was across the street from the house under which the remains were discovered. Before they were found, Mr. Wright had made various statements indicating that he had shot Rosalind, cut her up, and hid her body. Eventually, he was arrested and a grand jury indicted him with one count of second degree murder, a violation of La. R.S. 14:30.1(A)(1). He waived formal arraignment and entered a plea of not guilty. However, a jury found him guilty as *1114 charged. Mr. Wright requested a new trial and a post-verdict judgment of acquittal, both of which were denied. The trial court sentenced him to life imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence. The court ordered the sentence to run consecutive to any other sentence previously imposed. Mr. Wright challenges his conviction.
ERRORS PATENT
In accordance with La.Code Crim.P. art. 920, we review all appeals for errors patent on the record's face. After reviewing the record, we find none. However, we do note that at the sentencing proceeding, the judge stated, "[a]s required by law, I inform you that this offense is a crime of violence. Your sentence is not subject to diminution for good behavior, because it is without benefit of probation, parole or suspension of sentence as required by law." The judge was in error in the reason he gave. Mr. Wright's ineligibility for diminution of his sentence for good behavior is not automatically determined by law; rather, it is within the judge's discretion under La.Code Crim.P. art. 890.1.[1] That article clearly gives the judge this discretion in cases where the crime is one of violence.[2] Since the judge did reference this fact in his reasoning, correction of this technical error is not warranted.
We must decide: 1) whether the evidence is sufficient to prove Mr. Wright's specific intent; 2) whether the trial court erred in denying his request for a new trial; and, 3) whether evidence of his drug dealings was erroneously admitted.
SPECIFIC INTENTSUFFICIENCY OF EVIDENCE
Mr. Wright claims the evidence was insufficient to prove that he had the specific intent to kill or inflict great bodily harm on Rosalind Greenhouse. He argues that, independent of his own statements, no direct evidence was presented showing that a murder occurred or that Rosalind Greenhouse was the victim; the evidence was entirely circumstantial and did not exclude every reasonable hypothesis of innocence. We disagree.
On February 23, 2000, Detective John Augustine was notified that a plumber found a human skull lying on a sheet under a house. According to the Detective, Rosalind Greenhouse, a seventeen-year-old female, had been reported missing in April of 1998 and was still missing when the skull was found. No other persons had been reported as missing. Believing the skull belonged to Rosalind, he obtained a DNA sample from Rosalind's mother, Janet Greenhouse, and submitted the sample, along with the skull and other bones found under the house, to a crime lab for testing. He noted that the report submitted by the lab "was consistent with the bones being related to Mrs. Janet Greenhouse ..." After several witnesses were interviewed, Mr. Wright was arrested.
Janet Greenhouse testified that she last saw Rosalind in April 1998. Rosalind was living at home but had mentioned going to Mississippi with a friend, Kimble Browders. Over her mother's objection, Rosalind went to Kim's house to visit one evening. When she returned, she ate supper and went to bed. The next morning, Mrs. Greenhouse went to check on Rosalind and discovered that all of her belongings were gone. One of Rosalind's friends told Mrs. Greenhouse that Rosalind had gone to Mississippi.
Ms. Browders testified that in the first part of 1998, she moved into Apartment Number 14 on Scallan Street, almost directly *1115 across the street from the house under which the bones were found. About a month after she moved in, Mr. Wright moved in with her. According to Ms. Browders, Mr. Wright supported himself by doing odd jobs and selling crack cocaine. She testified that Rosalind, who watched her little girl from time to time, also moved in with her about two weeks to a month after Mr. Wright's arrival. Approximately two to three weeks later, Ms. Browders, her little girl, and Rosalind went to live in Mississippi, while Mr. Wright remained in the apartment. They were in Mississippi by the latter part of March 1998.
In the early part of April 1998, Ms. Browders returned to Marksville to bring Rosalind home. She dropped her off at the apartment and went in to get some paperwork but she did not see Mr. Wright at that time. She did not know if the electricity was still on. She suspected the water had been cut off because the toilet was full of feces. She left Rosalind at the apartment and headed back to Mississippi.
Brenda Coleman, Ms. Browders' neighbor, remembered Ms. Browders and Rosalind going to Mississippi in March 1998 and returning about a month later. She stated that Ms. Browders went into her apartment to get a few things and then left; Rosalind came to the apartment later. Ms. Coleman also saw Mr. Wright at the apartment later that night. When asked what she heard going on in Ms. Browders' apartment, she replied, "I heard a lot of banging against the wall, like a headboard was hitting against the wall about two (2) or three (3) hours. I didn't know what that was." She assumed the noise was from a man and a woman having intercourse. She saw Mr. Wright, through his open backdoor, sweep mopping the kitchen floor and later saw him leave with a big garbage bag. She never saw Rosalind again.
Nina Jones testified that she and her brother and sister had been out drinking with Mr. Wright on one occasion and Mr. Wright had said to them: "Let me trip ya'll out. I killed that girl. That girl is dead." When Ms. Jones asked him who he was talking about, he replied, "Rosalind." Further, Ms. Jones testified:
A. He said they was fighting. Well, he said he fought, then he said he cut her. He shot her and he cut her.
Q. Did he catch her doing anything? Did he ...
A. It all boiled down to something about the dope. She took his dope, this and that.
Q. She took his dope and he said he did what?
A. And he killed the bitch.
Q. And that's how he put it; he killed the bitch? And you say he said he cut her up?
A. That's what he said. But you know, a lot of people say things and it be some lies.
Ms. Jones did not believe him at the time because "he would say stuff like that all the time." She changed her mind when the bones were found. She also remembered her sister calling her crying because Mr. Wright had shown her a bone. When asked if he ever told her what he did with the body, she stated, "Yeah. He put it in wrapped it in some sheets or a blanket and put it in a garbage bag." She testified that he told her that the murder occurred at that apartment and he indicated that he tried to clean the apartment and had asked others to help him clean it.
America Malbrough, Mr. Wright's cousin, testified that when Mr. Wright would get drunk, he would cry and say he did something wrong. She testified that her mother went to Arizona in April of 1998 for three days and, during this time, Mr.
*1116 Wright brought two bags of clothes for America to wash. One bag contained bloody white T-shirts and the other contained colored shirts. Mr. Coleman, who was checking on the house in Ms. Malbrough's absence, corroborated this. They both saw the blood on the shirts before America washed them. When America's mother came home, she threw half of the clothes away. Shortly after her mom returned home, Mr. Wright asked America if she and her brother could help him clean the apartment, but their mother said no.
Michael Malbrough, America's brother, went with him to the apartment on Scallan Street, sometime in April of 1998. He testified that he would not go in. He stopped at the door because there was a foul, rotten smell coming from the apartment. He also testified that the sofa and chairs were turned over, like Mr. Wright was moving out.
Charlene Boyer, an acquaintance of Mr. Wright, testified that he once told her that he would have something to tell her in ten years. He then called her outside and showed her a long bone. She said that the bone looked like it came out of a leg. When asked if they ever had a conversation concerning Rosalind Greenhouse, Ms. Boyer testified that Mr. Wright told her that Rosalind stole his dope. He told her that he shot Rosalind. He never told her where the body was but said that they would never find his clothing. When the bones were found, Ms. Boyer went to see a detective.
Darrell Stanley, a fellow inmate, was asked whether Mr. Wright ever talked about the charge of murder against him. Mr. Stanley said the Defendant "looked at [him] dead serious in the face and told [him] he did kill her."
Carol Dominick had known Mr. Wright for three or four years. She testified that once while he was drinking, he told her that he killed Rosalind and dismantled her parts. Specifically, he said that he raped the victim, killed her, and cut her up.
Monique Alexander, who dated Mr. Wright for two years, stated that she was drinking with him one night at a nightclub when he said, "I killed that bitch;" however, she did not know that he was talking about Rosalind.
Byron Badeaux was incarcerated with Mr. Wright for approximately six weeks. Mr. Badeaux reported that the following conversation took place between them:
A. He spoke of the situation where hehe was guilty of the crime. He said he had killed the girl. He never specified any way, how of the actual murder. But there was a cane knife spoken of that was talked about to cut the body up, to get rid of the corpse.
Q. So he said he killed her. He didn't tell you exactly how?
A. That's correct.
Q. But he did indicate that he cut the body up with a cane knife?
A. Yes, sir.
Q. Did he indicate why he killed her?
A. It was overit was over a drug situation. I'm not exactly sure. He didn't specify what type. But it was over drugs.
The Defense called one witnessBrenda Coleman, the woman who lived next door to Kim Browders' apartment on Scallan Street. She testified that she did not hear a gunshot the night she heard Rosalind and Mr. Wright in the apartment next door.
Detective Augustine's report from the day of Mr. Wright's arrest reads: "[h]e [Mr. Wright] stated to me he would write everything down that happened in reference to the death of Rosalind Greenhouse. He stated he had to get it off his mind."
*1117 Mr. Wright claims the State failed to establish that the victim was Rosalind Greenhouse. However, all of the evidence points to Rosalind Greenhouse. She was the only missing person reported. Moreover, considering the State's two experts' testimonies, one in DNA analysis and the other in forensic anthropology, along with the evidence of Mr. Wright's own admissions, Mr. Wright has failed to show that the evidence, indicating the remains belonged to Rosalind Greenhouse, was insufficient.
Dr. Pat Wojtkiewicz, accepted as an expert in the field of DNA analysis, testified that his lab tested a tooth, an arm bone, and a reference sample Rosalind's mother provided. The latter was used to determine, through mitochondria DNA, whether the bones could belong to a maternal relative of Mrs. Greenhouse. Mitochondria DNA is not highly individual between persons; rather, as Dr. Wojtkiewicz testified:
It's only passed from the mother to the children. And this is primarily the type of DNA that's used to type skeletal remains or bones from ancient sites and so forth.... And its type is used for skeletal remains because it's a longer lasting and more numerous a quality of that DNA. So typically, when we do skeletal remains, we'll do mitochondria DNA typing.
Dr. Wojtkiewicz explained that the type of mitochondria DNA samples examined in the present case has not been found in Caucasian, Hispanic, Asian or Native Americans. Further, it has been observed only in two of 928 African samples.
Additionally, Dr. John Verano, accepted as an expert in forensic anthropology, examined the remains found in the present case and concluded that the skeletal remains were consistent with an African American female, approximately 16 to 20 years of age. According to Rosalind's mother, Rosalind's teeth were in perfect condition when she disappeared. This is consistent with Dr. Verano's testimony that he did not observe any cavities or fillings in the skull.
He noted that none of the human bones showed carnivorous damage and that the head was partially mummified, both of which were indications that the body was not placed under the house right away. Dr. Verano had previously mentioned damage to the elbow, which he agreed could have occurred if the body was being dismembered. When asked if the death of the person to whom the skeletal remains belonged could have been accidental, Dr. Verano stated:
I guess what I would say is that the circumstances under which the remains were found are highly suspicious and what I would say is that in my opinion it would be highly unlikely that someone died accidently or committed suicide and ended up under that house without human aging. And my argument comes from the fact that, that skull shows so much dry tissue that in my opinion it must have been kept somewhere protected from flies, protected from carnivores[.]
Dr. Verano further stated that he saw "human factors in manipulation of the body."
Mr. Wright claims the State failed to establish corpus delicti. In other words, the State's only proof that Rosalind died from a criminal act was Mr. Wright's own uncorroborated confessions.[3] However, the independent proof necessary to satisfy corpus delicti may be either direct or *1118 circumstantial and does not have to go to every element of the offense; it need only establish the commission of a criminal act.[4]
We find that the State introduced sufficient evidence that the bones found were the remains of Rosalind Greenhouse. Although this evidence included Mr. Wright's statements, there was sufficient independent evidence to prove the remains belonged to Rosalind. Additionally, the State introduced independent evidence that Rosalind died because of criminal activity. The victim's body was found under a house located across the street from the apartment where she was last seen and in which Mr. Wright lived. Dr. Verano testified that because of various reasons, he believed that the victim's body was kept somewhere for a period of time before it was placed under the house. Additionally, the skull was found lying on a sheet, a fact which corroborates Mr. Wright's statement that he wrapped her body in some sheets or a blanket and put it in a garbage bag. The day after Brenda Coleman heard noises coming from the apartment next door, she saw him sweep mop the kitchen floor and leave with a big garbage bag. He brought his cousin two bags of clothes containing bloody T-shirts to be washed. Finally, his cousin, Michael Malbrough, stated that he smelled a rotten, foul odor in the Defendant's apartment and noticed that furniture was turned over. Even though the evidence is circumstantial, it excludes every reasonable hypothesis of innocence.[5]
While Mr. Wright acknowledges that he made many statements indicating that he killed Rosalind Greenhouse, he stresses the fact that those statements were made while he was drinking heavily and they differed from one recipient to another. He also characterizes these witnesses' testimonies as being highly questionable. Notwithstanding, they were examined about the circumstances under which the statements were made, about the fact that they did not believe him when he first made the statements, and, when pertinent, about their respective criminal records. Nonetheless, the jury apparently chose to believe at least some of them.
Mr. Wright's final argument challenging the sufficiency of the evidence asserts that the State failed to rule out the possibility that Rosalind was killed by provocation or in the heat of passion. He argues that if the trier of fact believed that he made the statements which the State's witnesses asserted, the trier of fact should have also believed that he killed Rosalind "over an argument concerning missing drugs." However, the burden of proving provocation or "heat of blood" is not the State's burden.[6] Mr. Wright has the burden of proving these mitigating factors. On review, we ask only whether, viewing the evidence in the light most favorable to the prosecution, the trier of fact could have found that he had not established these factors.[7]
In the instant case, the jury could have easily determined that he failed to prove that the killing was precipitated by Rosalind stealing his drugs, that the stealing immediately preceded the killing, or that the stealing alone would have been sufficient provocation to reduce the verdict to manslaughter.
REQUEST FOR NEW TRIAL
Mr. Wright filed a motion entitled Motion for Post-Verdict Judgment of Acquittal, but, in substance, it also included a *1119 motion for new trial. La.Code Crim.P. art. 851 provides for the granting of a new trial whenever "[t]he verdict is contrary to the law and the evidence...." "When ruling on a motion for new trial, the trial court must apply the `thirteenth juror' standard and review the weight of the evidence."[8] La.Code Crim.P. art. 821, on the other hand, provides for the granting an acquittal "if the court finds that the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilty." Mr. Wright's arguments under both articles are essentially the same.
He maintains that when the trial court ruled on the motion for new trial, it failed to consider whether the verdict was contrary to the law and evidence. He asserted that the evidence did not sufficiently show that Rosalind Greenhouse was the victim nor that the victim died because of a criminal offense. After making additional arguments regarding the sufficiency of the evidence, he urged that a new trial should have been granted because testimony was introduced that referred to him as a "drug dealer," as a person who was "slinging dope," as a person who raped the victim, and as a person who was always running from the police. He argued that all of these references were to inadmissible other crimes evidence. Finally, he contended that none of his statements should have been admitted before the court's determination that corpus delicti had been sufficiently proven.
After allowing the State to present its arguments, the trial court denied the motion for post-verdict judgment of acquittal, finding that in "[t]he light most favorable to the state, the evidence certainly justify [sic] their conviction without question." The trial court denied the motion for new trial, ruling as follows:
Now, as to the New Trial, we previously discussed, on the record several times, this court's belief on the other crimes' evidence, and in this case, they squarely fit the presentation as presented by Mr. Lafargue, for the state squarely fits under the Code of Evidence; and was admissible to prove all matters submitted by the State.
Certainly, there was a lot of circumstantial evidence in this case, and ended up being of an overwhelming nature. But, this court is convinced that the other crime [sic] evidence was properly admitted.
AND, THEREFORE, the Motion for New Trial is also DENIED.
The trial court did not specifically state that it was considering whether the verdict was contrary to the law and evidence when it ruled on the motion for new trial; however, although it was in the written motion, defense counsel did not orally argue that claim before the trial court. Consequently, he waived it.[9] Furthermore, he did not object to the trial court's failure to rule on it; therefore, he is precluded from raising the issue on appeal.[10]
Additionally, it is apparent from the trial court's ruling on the motion for post-verdict judgment of acquittal that it actually considered the evidence as a thirteenth juror. Thus, it ruled on Mr. Wright's claim that the verdict was contrary to the law and evidence. In his ruling on the *1120 motion for post-verdict judgment of acquittal, the trial court stated:
And, in this cae [sic], the state started with alike a puzzle from when we were kids; and they didn't have, really, any pieces to it, except some bones. And, they started with that puzzle. And, quite frankly, before trial, I never thought they were going to build the puzzle. But, they built it in such a manner that every piece fit exact. They started off with these bones; ended up identifying, and, through experts, Mr. Wright made various statements; they had more witnesses than I knew, as to the statements that he made, and also the physical things, the most compelling being the night Ms. Coleman sees the young lady in the apartment does not leave.... And then, Mr. Wright begins to tell people what he's done. He shows the bones. He tells people that he's killed her. He was his own worst enemy, after the fact, by telling so many people.
When the trial court ruled on the motion for new trial, it stated that the evidence was circumstantial and "ended up being of an overwhelming nature." These statements reflect the trial court's consideration, as a thirteenth juror, of the weight of the evidence introduced to the jury.
Finally, Mr. Wright asserts that the trial court failed to properly consider the sufficiency of the evidence claim. However, in addressing his motion for post-verdict judgment of acquittal, the trial court considered the sufficiency of the evidence and found that in "[t]he light most favorable to the state, the evidence certainly justify [sic] their conviction without question." Thus, the court properly considered the sufficiency of the evidence claim. The trial court's ruling was correct.
ADMISSIBILITY OF EVIDENCE RELATING TO DRUG USE
Lastly, Mr. Wright claims the evidence of his selling crack cocaine was improperly admitted at trial and, alternatively, that his attorney was ineffective for failing to object and for failing to request a Prieur hearing. At the close of the State's case, defense counsel moved for a mistrial, claiming that evidence of Mr. Wright's drug dealing was improperly admitted. However, Mr. Wright was given notice of the State's intent to introduce the evidence and that such evidence was admissible to prove motive. In fact, Mr. Wright, himself, stated that he killed the victim because she stole his "dope." Thus, the trial court denied the motion for mistrial, stating: "Notice was given. The evidence of other crimes goes to show motive as to the drug dealing ..."
Apparently acknowledging that the Defense received notice of the State's intent to offer such evidence at trial, appellate counsel claims that no formal Prieur hearing was held in advance of trial. However, the record does not indicate that defense counsel requested a Prieur hearing after being notified of the State's intent to introduce such evidence. This fact would undermine any assertion that a contemporaneous objection was made.[11] Furthermore, appellate counsel has failed to point to any in the record.
Although a mistrial was ultimately requested, it was too late since it was not made at the time that the alleged errors occurred.[12] However, the record does indicate that the admissibility of the evidence of Mr. Wright's drug dealing was *1121 discussed, either, during a bench conference or at some other point during trial. Therefore, we will address the merits of his argument.
Appellate counsel claims that evidence of Mr. Wright's drug dealing was not res gestae or a necessary incident to the murder. Thus, the State could have easily presented its case without referring to the evidence. Appellate counsel makes no argument, however, concerning whether the evidence could have been admitted to prove motivethe purpose for which the trial court approved it admission.
In State v. Cotton,[13] our supreme court stated:
As a general matter, "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." However, such evidence may be admissible to prove "motive, opportunity, intent, plan, knowledge, identity [or] absence of mistake or accident." The inquiry, however, does not end with the determination that the other bad acts evidence is admissible for one of the article 404(B) purposes. For, "even if independently relevant, the evidence may be excluded if its probative value is substantially outweighed by the dangers of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time."
(Citations omitted.)
According to witnesses, Mr. Wright stated that he killed the victim because she stole his "dope." Thus, the State's proof of motive was based on his anger at the victim for stealing his drugs. The fact that he sold drugs was relevant in establishing this motive because it shows that he would be angry for losing the money he would have made had he been able to sell the drugs. Furthermore, the probative value of such evidence outweighed any prejudicial effect it may have had on his case. Consequently, the trial court correctly found that evidence of Mr. Wright's selling drugs was admissible to prove motive.

CONCLUSION
For the foregoing reasons, we affirm Mr. Wright's conviction.
AFFIRMED.
NOTES
[1] State v. Narcisse, 97-3161 (La.6/26/98); 714 So.2d 698.
[2] La.Code Crim.P. art. 890.1(B).
[3] State v. Thibodeaux, 98-1673 (La.9/8/99); 750 So.2d 916. cert. denied, 529 U.S. 1112, 120 S.Ct. 1969, 146 L.Ed.2d 800 (2000).
[4] Id.
[5] La.R.S. 15:438.
[6] State v. Hamilton, 99-523 (La.App. 3 Cir. 11/3/99); 747 So.2d 164.
[7] Id.
[8] State v. McCullough, 00-983, p. 39 (La.App. 3 Cir. 12/6/00); 774 So.2d 1105, 1127, writ denied, 01-533 (La.1/25/02); 806 So.2d 669.
[9] See State v. M.M., 00-1296 (La.App. 3 Cir. 8/29/01); 802 So.2d 43, writ denied, 01-3370 (La.10/4/02); 826 So.2d 1121.
[10] See State v. King, 96-1303 (La.App. 3 Cir. 4/2/97); 692 So.2d 1296.
[11] State v. Cooks, 97-999 (La.9/9/98); 720 So.2d 637, cert. denied, 526 U.S. 1042, 119 S.Ct. 1342, 143 L.Ed.2d 505 (1999).
[12] See State v. Stracener, 94-998 (La.App. 3 Cir. 3/1/95); 651 So.2d 463, writ denied, 97-696 (La.11/7/97); 703 So.2d 1261.
[13] 00-850, p. 12 (La.1/29/01); 778 So.2d 569, 578.