WILLIAMS J.
 

 I, The defendant, Edward Charles Triggs, was charged by bill of information with two counts of attempted first degree murder, in violation of LSA-R.S. 14:30 and 14:27, and one count of the unauthorized use of a motor vehicle, in violation of LSA-R.S. 14:68.4. Following a jury trial, the defendant was found guilty of attempted second degree murder and attempted manslaughter.
 
 [1]
 
 He was sentenced to serve 42 years in prison at hard labor without benefit of probation, parole or suspension of sentence for the attempted second degree murder conviction. With regard to the attempted manslaughter conviction, the defendant was sentenced to serve 18 years at hard labor. The sentences were ordered to be served concurrently. For the reasons set forth herein, we affirm the defendants’s convictions and sentences.
 

 
 *485
 
 FACTS
 

 On October 8, 2005, at approximately 4:00 a.m., the defendant drove to the home of his estranged wife, Glenda Webb.
 
 [2]
 
 The defendant and Webb had been living separately since May of that year. Webb’s friend, James King, was staying with her that night. When the defendant arrived at Webb’s home, he broke the guest bedroom window and climbed into the house. Webb testified as follows:
 

 Going back, it was about four o’clock or so I heard a noise. And I never thought anyone was breaking in because the security system was on, and I thought maybe — it sounded like glass breaking. So I thought maybe I had left a candle because I love to burn candles. I 12thought maybe I had left a candle burning and, you know, the glass was cracking or a pot on the stove or something. And so I got up. I was getting up to check to see what was going on. And as far as I can remember, when I got up, [the defendant] was at my bedside. I was up and that’s when I felt something go to my head. I didn’t know at the time what it was. I thought that maybe he just had hit me in the head with something. And I think at that point he went to go out. And my only thought was to get him out and close the door. So not thinking, I went behind him. And at that point we were in the kitchen, and he started talking. And then that’s when he — I realized he had a gun, and he shot me here (indicating) and behind the ear. And I don’t know when that one happened, if maybe I was trying to brace myself. And then he started to go around the counter in the kitchen. And I recall I was — felt like I was about to pass out. So I was just kind of hanging on the counter. Only thing I remembered him saying, that all he wanted was his mother’s furniture. He never really asked me for that. Basically, that’s what I remember of that part of the conversation. And I believe he started to head out and that’s when I called for Mr. King. I called, James, James. And I think at that point he went back into the bedroom, and that’s when he shot Mr. King.
 

 * * *
 

 I remember him going back out. And, again, I am still thinking, close the door, get him out. Close the door. So I went behind him and I locked the door. And when I came back, I felt like I wanted to pass out. So I just laid [sic] in the bedroom on the floor. And I was trying to call — had the phone book trying to call the police department. What had happened, when he went out the door the security system went off. And at that point when the security system goes off, it shuts down the phone system. It shuts down the phone.
 

 So I couldn’t use the house phone to call 911. And I am thinking I can’t call 911 from my cell phone because they won’t know so I was trying to use my cell phone to call the police. And by that time, the security company called, and I told them that I had been shot and my husband had shot me. Get the police. And I don’t remember much after that.
 

 Webb testified that she and the defendant had been having some ^disagreements prior to the shootings. She testified that several months before, she and the defendant had agreed on certain property in the house that he could
 
 *486
 
 have, “[b]ut I had given him a specific time as to when he could get it, and he didn’t want to wait until that time. I was working, working two jobs. And, of course, through the week it was pretty busy. I told him he could come by that Saturday and get it; and he wanted to come sooner than that.” Since no resolutions of the issues between Webb and the defendant were forthcoming, Webb discontinued all communication with the defendant in August 2005. The defendant continued to attempt to contact Webb repeatedly, but she refused to speak with him. Webb testified that she informed the defendant that they would simply let the court handle the disposition of the property because the divorce was not final.
 

 In January 2005, prior to separating from the defendant, Webb reconnected with James King, a childhood friend. King first visited Webb in August 2005, before Webb discontinued all communication with the defendant. Webb testified:
 

 Mr. King had come to visit. I was working at Dillard’s part-time at the time and [the defendant] called. I think Mr. King had dropped me off at work. And [the defendant] called, wanted to know what was wrong with my car. I told him it was fine, and then he said he wanted to come by and pick up the TV. And I told him that he could come by on Saturday to pick up the TV. And that was pretty much the end of that conversation.
 

 But when we got home, I think I went to go out the garage or something. And I noticed a car parked in front of the house in the driveway. And Mr. King was standing in the door to the garage when I let it up. So [the defendant], I think, saw [Mr. King] at that time. He didn’t know who it was or anything. He just saw someone at the house at that time. And, of course, he |4wanted to come in, and I wouldn’t let him in.
 

 So I went to go out to leave the house and [the defendant] and the person that brought him over blocked my driveway. They blocked my driveway. So I went out across the yard. And at that point they chased me around the neighborhood. So that particular night, I told Mr. King, well, we are not going to stay here. So we got a hotel room.
 

 Webb testified that the defendant was shouting obscenities out the window at her as he and the driver of the vehicle chased her.
 

 Webb further testified that the defendant’s harassing behavior continued after that incident:
 

 Because at that point after that night, that particular night in August, he started to — harassing me. And I recall there was one morning I went to go out the driveway and my neighbor stopped me. And he told me there were nails all across my diiveway. In fact, he picked a couple of those up and saved them for me. And after August, the conversation — he started just harassing me, harassing me, and he was even calling me at work harassing me and at both places. And I notified the security at — ■ on my job that he had been calling and also security on my part-time job at Dillard’s that he had been calling. In fact, there were a couple times that my coworkers intercepted the calls. And he had ugly words to say, and I filed a complaint. And I believe at that time that’s when I started to file complaints with the police department.
 

 Webb also testified that the defendant’s allegation that he came to the house to retrieve his belongings was untrue. She stated:
 

 He had several opportunities to get things that he wanted. In fact, one time
 
 *487
 
 he came by the house with the police under the pretense that he wanted to get something out of the house. I don’t remember the officer’s name. It was a woman. And he went all through the house looking. I don’t know what he was looking for, but just looking all through the house. And the officer told him, you know, Mr. Triggs, you get what you need. And the only thing he left out the house with was just a little box. So he was not there to pick up I ¡¡anything.
 

 James King also testified with regard to the events that took place on October 8, 2005. King stated:
 

 I was asleep, and I heard an argument. And she says, “What are you doing in here? How’d you get in?” And I really didn’t know what he said. He said something, and then he just shot her. He made three shots. Okay?
 

 [[Image here]]
 

 And when I went to get up, he ran in there and shot me twice. And it was like a closet door, and I was looking for something to try to protect myself, and I couldn’t find nothing. And he shot me in my hand. Then he shot me again in my head. And I just laid there for a few minutes. I could hear, but I couldn’t really move. And I heard the alarm go off, and I figured he ran out the door.
 

 [[Image here]]
 

 And so when I gathered myself, I went in looking for Ms. Webb. She was lying down on the floor in a pile [sic] of blood. And I — which she came back through and she asked me was I okay. And so by that time the police or ambulance or someone came, and I was sitting on the chair, and they wanted to get in. And she had passed back out on the floor, and so I let them in.
 

 King testified that he did not get a good look at the assailant, but he recognized the defendant’s voice because the defendant had been making harassing and threatening phone calls to him for several months. King stated, “He called seven, eight times a day, which my phone wouldn’t be on. He would just leave voicemail messages.” King testified:
 

 I knew his voice. He was calling my name out. He — I knew his voice from the voicemails he had left me. And a couple of times he called me on my cell phone when I had it on once or twice, and I actually talked to him. And I remember those voices. And I was going to work one morning and my cell phone rang, and they didn’t say anything. So I had the number in my cell phone, you know, from the caller. So I called back that number and this lady answered the phone and she cursed me out. And she says that you got the wrong so-and-so number. Don’t no Edward Triggs live here. He don’t have my | ^number. And I guess ten minutes later he called back, same number. He called back and then he started swearing and stuff. So I just hung up.
 

 During cross-examination, King testified:
 

 I didn’t have nothing to do with Mr. Triggs. I keep telling you that. Basically, only one conversation I had. I had two conversations with him, once when he called me, and another one I had my son in my car with me one day, [in] my truck. We was [sic] going fishing, and my son wanted some Kentucky Fried Chicken. And when I got back to the truck he says that a man called for you. He answered my cell phone. And I said, “Who was it?” And he says: “I don’t know, but he was swearing at me.”
 
 *488
 
 So I go, “He was swearing at you?” So I got my phone, looked at my phone. I punched it up and there was that number. And I knew who it was, but I didn’t call him because I knew it was just going to get into a whole lot of stuff. So I didn’t even call him.
 

 The defendant also testified during the trial. He testified that when he woke up on October 8, 2005, he “just decided” to go to the house and get his furniture. He stated that the house was dark when he entered it and when he saw Webb, he “just started pulling the trigger on the gun.” The defendant stated, “I just wanted to hurt her like I was hurting.” With regard to the shooting of King, the defendant testified:
 

 We were in the kitchen area, and she called his name. And I guess I was halfway gone or basically I had lost it. When I heard her call his name I went to our bedroom, which is the master bedroom. And the area where he was standing is where the commode is and a shower that’s in part of the bathroom. He was standing in there. And I just took the gun and just — trying to hurt him like I was hurting.
 

 Police officers received three 9-1-1 calls reporting the shooting — one from Webb, one from the security company that monitored Webb’s home security system, and one from the defendant. Officer Bonnie Tindle was the 17first officer on the scene. Officer Tindle testified that when she arrived, she observed a black male standing in the driveway of the home attempting to flag her down. She stated that the man’s clothing was covered in blood. Officer Tindle stated:
 

 Upon exiting my vehicle, I approached him and — well, at first I didn’t know who he was. I didn’t know if he was the person who had got shot or the victim [sic]. And when I approached him he made a statement to me and said: “I shot them. They are in there.” And he stated to me that the gun was — and he took me to a location behind me, and I turned around and noticed that there was a gun covered with blood on the back of a silver or gray-colored vehicle. [The vehicle] was a Neon.
 

 Officer Tindle testified that she entered the home after another officer arrived on the scene to take custody of the defendant. The officer stated that she first encountered King, who was bleeding from his head. King directed her to the back bedroom, where she encountered Webb exiting the bedroom. Officer Tindle testified:
 

 [Webb] was walking. But I could see that blood was coming from her head. And at that time she was sort of shaky. I advised her to get on the floor and lay [sic] down until the — I had told her I had the paramedics on the way.
 

 After the paramedics arrived, the defendant was seated on the curb awaiting transport. Officer Tindle testified that as the paramedics wheeled Webb past the defendant, she heard the defendant say, “I should have killed your ass.”
 

 Officer Jared Woods was also dispatched to the scene of the shooting. Officer Woods testified that as he was walking up the driveway to speak to the other assembled officers, he heard the defendant repeatedly saying under | «his breath, “I should have killed her. I should have killed her.” After securing the scene, and as the paramedics were wheeling Webb to the ambulance, Officer Woods heard the defendant saying, “I should have killed her.”
 

 Officer Anthony Kelly was instructed to keep watch over the defendant while he was awaiting treatment for a cut on his arm. Officer Kelly testified as follows:
 

 
 *489
 
 He did make some statements while he was sitting on the curb. Because we had him sitting next to the curb next to the first medic unit that was there. And the statements were made when they was bringing the female victim out of the house and then putting her into the medical unit.
 

 [[Image here]]
 

 I can’t exactly quote exactly what he made word for word. But he did make a statement in reference to shooting her and I should have killed her. He used profanity afterwards. If I am not mistaken, profanity was the last word he said in reference to Ms. Webb.
 

 Officer Kelly also testified regarding the video from his patrol unit:
 

 Okay. First we observe me bringing the defendant to my patrol unit because like I say, I was assigned to keep an eye on him during the time at the scene and everything for the crime scene to show up. As I was bringing him to my unit, we were still standing outside my unit basically almost right between the passenger and rear door. The medic unit was bringing the second victim out and everything. And as they brought him right about up in here getting ready to load him on, that’s when he made a statement about he shouldn’t have missed and that he hated he missed.
 

 Sergeant Danny Duddy, a member of the Crime Scene Investigations Unit for the Shreveport Police Department, also testified. Sgt. Duddy, who was asked to photograph the scene that night, testified that blood was found throughout the house. He stated that a “projectile” was found on the floor | Hof the kitchen which indicated “[t]hat a shot was fired in the kitchen.”
 

 Following a jury trial, the defendant was convicted of the attempted second degree murder of Webb and the attempted manslaughter of King. The defendant was sentenced to serve 42 years in prison at hard labor without benefit of probation, parole or suspension of sentence for the attempted second degree murder conviction. With regard to the attempted manslaughter conviction, the defendant was sentenced to serve 18 years at hard labor. The sentences were ordered to be served concurrently. The trial court denied the defendant’s motion for new trial, motion for post-verdict judgment of acquittal and/or to modify verdict and motion .to reconsider sentence. The defendant appeals his conviction for attempted second degree murder and his sentences.
 

 DISCUSSION
 

 Sufficiency of the Evidence
 

 The defendant contends that the evidence was insufficient to prove his guilt of attempted second degree murder in the shooting of Webb. The defendant argues that he met his burden of proving that he acted in a “sudden passion” or “heat of blood” and, therefore, the evidence supported a manslaughter conviction. The defendant also argues that he did not enter Webb’s house with the specific intent to kill her; rather, it was Webb who followed him out of her bedroom after he shot her once and instigated an argument with him, provoking him to shoot her two more times.
 

 The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to 11(1the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979);
 
 State v. Tate,
 
 2001-1658 (La.5/20/03), 851 So.2d 921, cert.
 
 *490
 

 denied,
 
 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004);
 
 State v. Cummings,
 
 95-1377 (La.2/28/96), 668 So.2d 1132;
 
 State v. Murray,
 
 36,137 (La.App. 2d Cir.8/29/02), 827 So.2d 488,
 
 writ denied,
 
 2002-2634 (La.9/5/03), 852 So.2d 1020. This standard, now legislatively embodied in LSA-C.Cr.P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder.
 
 State v. Pigford,
 
 2005-0477 (La.2/22/06), 922 So.2d 517;
 
 State v. Robertson,
 
 96-1048 (La.10/4/96), 680 So.2d 1165.
 

 The appellate court does not assess the credibility of witnesses or reweigh evidence.
 
 State v. Smith,
 
 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part.
 
 State v. Hill,
 
 42,025 (La.App. 2d Cir.5/9/07), 956 So.2d 758,
 
 writ denied,
 
 2007-1209 (La.12/14/07), 970 So.2d 529. The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law.
 
 State v. Casey,
 
 99-0023 (La.1/26/00), 775 So.2d 1022, cert.
 
 denied,
 
 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000).
 

 Any person who, having a specific intent to commit a crime, does orjnomits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose. LSA-R.S. 14:27(A). Second degree murder is “the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm.” LSA-R.S. 14:30.1(A)(1). LSA-R.S. 14:31(A)(1) defines “manslaughter” as follows:
 

 A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed.
 

 The elements of “sudden passion” and “heat of blood” are mitigatory factors in the nature of a defense, and when the defendant establishes such factors by a preponderance of the evidence, a verdict for murder is inappropriate.
 
 State v. Leger,
 
 2005-0011 (La.7/10/06), 936 So.2d 108;
 
 State v. Allen,
 
 41,548 (La.App. 2d Cir.11/15/06), 942 So.2d 1244,
 
 writ denied,
 
 2007-0530 (La.12/7/07), 969 So.2d 619. In addition, provocation and time for cooling are questions for the jury to be determined under the standard of the average or ordinary person, one with ordinary self-control.
 
 See
 
 Reporter’s Comment to LSA-R.S. 14:31;
 
 State v. Mayfield,
 
 186 La. 318, 322, 172 So. 171, 172 (1937);
 
 State v. Allen, supra.
 

 A defendant who establishes by a preponderance of the evidence that |12he acted in a “sudden passion” or “heat of blood” is entitled to a manslaughter verdict.
 
 State v. Lombard,
 
 486 So.2d 106 (La.1986). In reviewing such a claim, the reviewing court must “determine whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a
 
 *491
 
 preponderance of the evidence.”
 
 Id.
 
 at 111.
 

 In
 
 State v. Quinn,
 
 526 So.2d 322 (La.App. 4th Cir.1988),
 
 writ denied,
 
 538 So.2d 586 (La.1989), the defendant killed his live-in girlfriend after she received a telephone call from a man the defendant believed to be her lover. At the scene of the crime, the defendant stated, “I lost my head.” The fourth circuit held that the receipt of a telephone call, even if it was from a suspected lover, was insufficient provocation to support a finding of “heat of passion.”
 

 In
 
 State v. Thorne,
 
 93-859 (La.App. 5th Cir.2/23/94), 633 So.2d 773, the defendant shot and killed his wife and her alleged lover. After the shootings, the defendant stated that his “wife would not f — k around on him again and [the alleged lover] would not f — k anybody else’s wife.” The defendant argued that he was sufficiently provoked and “just lost [his] head” because he was told “graphically” about his wife sleeping with the other victim. The testimony of witnesses to the shootings showed that the defendant remained calm during the time preceding the incident and never raised his voice or appeared upset. The court found that the defendant had not borne his burden of proving provocation or heat of passion, noting that the only evidence presented to show “heat of passion” was the defendant’s |isgraphic statements with regard to his wife’s sexual relationship with another man.
 

 In
 
 State v. Hamilton,
 
 99-523 (La.App. 3d Cir.11/3/99), 747 So.2d 164, shortly after separating from the defendant, the victim became romantically involved with another man. The defendant went to his estranged wife’s home, kicked the door in, grabbed the other man by his neck and said, “What are you doing here? That’s my wife. Who are you?” The defendant physically kicked the other man out of the house. Before fleeing the scene in his truck, the other man told the neighbors to call 9-1-1 because the defendant was going to kill the victim. The defendant shot and killed his estranged wife and one of the police officers who responded to the 9-1-1 call. The defendant appealed his convictions for two counts of first degree murder, contending he killed his estranged wife and police officer in “sudden passion” or “heat of blood.” The defendant argued that he had just found his wife, partially naked, having just engaged in sexual intercourse with another man. The court rejected the defendant’s argument, stating:
 

 The jury’s verdict may also reflect that they also concluded there was no provocation for the shooting of [the estranged wife]. The acts of the Defendant leading up to the shooting of [the estranged wife] establish that the Defendant may have planned to commit a criminal act when he forcibly entered her house.... Neither the Defendant seeing his estranged wife with a boyfriend, nor disputes between spouses over their impending divorce or overdue money payments, are sufficient provocation to reduce first degree murder to manslaughter.
 

 Id.
 
 at 169 (internal citations omitted).
 

 In the instant case, the defendant and Webb had been living apart for | useveral months and were in the process of divorcing. On the morning of the incident, the defendant got into his girlfriend’s vehicle, drove to his own apartment, retrieved a .22-caliber revolver and drove to Webb’s home. Armed with the firearm, the defendant entered Webb’s home by breaking a window and crawling through it. Once inside of the house, the defendant entered Webb’s bedroom and shot her in the head. The defendant then walked toward the kitchen, with Webb following, and shot Webb two more times. Thereafter, the defendant went back into the bedroom and
 
 *492
 
 shot King in the head, chest and hand. The defendant finally left the home and called 9-1-1 to report the shooting. After the shootings, the defendant showed no remorse for his action, stating, “I should have killed her.”
 

 The only evidence the defendant offered to prove “sudden passion” or “heat of blood” was the defendant’s statement that Webb followed him into the kitchen and asked him what he was doing in her home. The jurisprudence is clear — provocation must be sufficient to deprive a reasonable person of his or her cool reflection and reasoning. We find that Webb’s act of following the defendant and demanding an explanation for his uninvited presence in her home • at 4:00 a.m. was insufficient provocation to deprive a reasonable person of self-control to the point that he would attempt to commit murder. Indeed, the defendant’s argument ignores the fact that the defendant had already shot Webb once in the head prior to her act of following him into the kitchen. The defendant has not argued any provocation for the initial shooting, other than the fact that he wanted to get his furniture back from Webb. We find that the defendant’s desire to | ^retrieve his furniture was not sufficient provocation for shooting Webb. The fact that the defendant was unable to retrieve his furniture was not so immediate that it could qualify as sufficient provocation under LSA-R.S. 14:31 A(l).
 

 Therefore, viewing the evidence in the light most favorable to the prosecution, we find that the jury could have reasonably found that the defendant failed to prove the “sudden passion” or “heat of blood” mitigatory factors by a preponderance of the evidence. Accordingly, we affirm the jury’s verdict of attempted second degree murder with regard to the shooting of Webb.
 

 This assignment is without merit.
 

 Excessive S&iitence
 

 The defendant also contends the sentences imposed were constitutionally excessive. The defendant argues that the trial court failed to consider the fact that he was a first felony offender with a steady work history, and he was under emotional stress as a result of the pending divorce. The defendant maintains that the court ignored the fact that after he shot Webb, she followed him into the kitchen and started an argument with him, prompting him to shoot her several more times. Finally, the defendant argues that the sentences, although concurrent, amount to a life sentence without benefit of parole, and therefore, “shock the conscience” and should be set aside.
 

 The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show l1(ithat the trial court took cognizance of the criteria set forth in LSA-C.Cr.P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article.
 
 State v. Smith,
 
 433 So.2d 688 (La.1983);
 
 State v. Lathan,
 
 41,855 (La.App. 2d Cir.2/28/07), 953 So.2d 890,
 
 writ denied,
 
 2007-0805 (La.3/28/08), 978 So.2d 297. The articulation of the factual basis for a sentence is the goal of LSA-C.Cr.P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with LSA-C.Cr.P. art. 894.1.
 
 State v. Lanclos,
 
 419 So.2d 475 (La.1982);
 
 State v. Swayzer,
 
 43,350 (La.App. 2d Cir.8/13/08), 989 So.2d 267. The important elements which should be considered are the defendant’s personal history (age, family ties, marital status, health, employment rec
 
 *493
 
 ord), prior criminal record, seriousness of offense and the likelihood of rehabilitation.
 
 State v. Jones,
 
 398 So.2d 1049 (La.1981);
 
 State v. Ates,
 
 43,327 (La.App. 2d Cir.8/13/08), 989 So.2d 259. There is no requirement that specific matters be given any particular weight at sentencing.
 
 State v. Shumaker,
 
 41,547 (La.App. 2d Cir.12/13/06), 945 So.2d 277,
 
 writ denied,
 
 2007-0144 (La.9/28/07), 964 So.2d 351.
 

 Second, a sentence violates La. Const, art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering.
 
 State v. Smith,
 
 2001-2574 (La.1/14/03), 839 So.2d 1;
 
 State v. Dorthey,
 
 623 So.2d 1276 117(La.1993);
 
 State v. Bonanno,
 
 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice.
 
 State v. Weaver,
 
 2001-0467 (La.1/15/02), 805 So.2d 166;
 
 State v. Lobato,
 
 603 So.2d 739 (La.1992);
 
 State v. Robinson,
 
 40,983 (La.App. 2d Cir.1/24/07), 948 So.2d 379;
 
 State v. Bradford,
 
 29,519 (La.App. 2d Cir.4/2/97), 691 So.2d 864.
 

 The trial judge is given a wide discretion in the imposition of sentences within the statutory limits, and the sentence imposed by him should not be set aside as excessive in the absence of a manifest abuse of his discretion.
 
 State v. Williams,
 
 2003-3514 (La.12/13/04), 893 So.2d 7;
 
 State v. Thompson,
 
 2002-0333 (La.4/9/03), 842 So.2d 330;
 
 State v. Hardy,
 
 39,233 (La.App. 2d Cir.1/26/05), 892 So.2d 710. A trial judge is in the best position to consider the aggravating and mitigating circumstances of a particular case, and, therefore, is given broad discretion in sentencing.
 
 State v. Cook,
 
 95-2784 (La.5/31/96), 674 So.2d 957,
 
 cert. denied,
 
 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996). On review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion.
 
 Id.
 

 In the present case, our review of the record reveals that the trial court took into account the factors set forth in LSA-C.Cr.P. art. 894.1. The court stated:
 

 The Court has also reviewed the sentencing guidelines in the Code of Criminal Procedure, Article 894.1. The Court looks particularly at the fact that both victims in this case were shot in the head. The offenses involved | lxtwo victims being shot and the fact that each also were shot multiple times.
 

 The Court also looked at the fact that a firearm was used in the commission of these crimes. Although, they were not fatal shots, the testimony was and the report is that there were multiple gunshot wounds. And given the parts of the body that were shot causes great concern ... and goes to the intent of the defendant.
 

 Given the seriousness and the gravity of the two offenses, coupled with the minimal prior criminal history, which for this defendant includes misdemeanors, including arrests. It looks like of a family [sic] violence matter, which was nol-prossed. And that was quite some time ago. And also some history involving a simple battery and, I believe, an entering and remaining after being forbid[den], which would ultimately — apparently nol-prossed as well.
 

 Mr. Triggs does not have a significant criminal history. However, those matters taken together, in particularly the manner in which the offenses were committed, this Court believes that the sentencing — that sentences — or the higher end of the sentencing ranges are appropriate, given the totality of the circum
 
 *494
 
 stances surrounding the commission of these two crimes of violence.
 

 The sentence for attempted second degree murder is imprisonment at hard labor for not less than 10, nor more than 50 years, without benefit of parole, probation or suspension of sentence. LSA-R.S. 14:30.1; LSA-R.S. 14:27(D)(l)(a). The sentencing range for attempted manslaughter is not more than 20 years at hard labor. LSA-R.S. 14:31; LSA-R.S. 14:27(D)(3).
 

 We have reviewed the record to determine whether the sentences imposed — 42 years for attempted second degree murder and 18 years for attempted manslaughter — are grossly out of proportion to the seriousness of the offenses. We conclude that they are not. The defendant armed himself with a gun, broke into Webb’s home, entered her bedroom and shot her in |iathe head at close range. The defendant went into the kitchen and then shot Webb two more times — in the head and in the arm. The defendant testified, “I just wanted to hurt her like I was hurting.” The defendant also shot King three times — in the head, chest and hand. At the scene after the shootings, several police officers overheard the defendant stating that he “should have killed” Webb. Although the defendant claims that he is a nonviolent person, his actions, as well as his prior arrest record, belie that claim. The crimes committed by the defendant were extremely violent, and, considering the circumstances, the outcomes could have been profoundly more grim.
 

 Considering this record, the sentences imposed are not grossly disproportionate to the offenses of conviction, and do not shock the sense of justice. Thus, the trial court, which adequately articulated its reasons for sentence, did not abuse its wide discretion. The sentences are not constitutionally excessive.
 

 This assignment is therefore without merit.
 

 CONCLUSION
 

 For the foregoing reasons, we hereby affirm the defendant’s convictions and sentences.
 

 CONVICTIONS AFFIRMED; SENTENCES AFFIRMED.
 

 [1]
 

 . The defendant was found not guilty of unauthorized use of a motor vehicle.
 

 [2]
 

 . The defendant was driving a silver Dodge Neon belonging to Yolanda Anders, his girlfriend at the time.