MOORE, J.
 

 I,The defendant, Jessie James Williams, was convicted of attempted second degree murder. He was adjudicated a second felony habitual offender and sentenced to 100 years at hard labor to run consecutively with the remainder of his paroled conviction for forcible rape and with credit for time served. The defendant now appeals. We affirm.
 

 FACTS
 

 On August 2, 2008, police were called to the scene of a stabbing at an abandoned house in the 2800 block of Hardy in Shreveport. Upon arrival they found the victim, Carolyn Taylor, sitting on the front porch with an injured leg and with gashes in her throat bleeding profusely. The victim was able to identify her assailant, the defendant, Jessie James Williams.
 

 At trial, Ms. Taylor testified that she had known the defendant about a month and a half, and during that time, their interactions consisted mostly of smoking crack cocaine and having sex. She said that the defendant wanted a romantic relationship with her, but she told him when they first met that she was not interested in having a relationship, especially since she was a prostitute. Ms. Taylor stated that she tried to avoid the defendant.
 

 On the evening of the attack, Ms. Taylor was attending a barbeque. She called Williams and asked him to bring her something to eat because she was hungry, and the barbeque was not ready. The defendant brought her a ham sandwich and remained at the gathering. Soon another man named Rico, who was a friend of Ms. Taylor’s nephew, arrived at the gathering. He spoke with Ms. Taylor for a few minutes. Then, she and Rico then went to an abandoned house down the street to engage in sexual 12intercourse.
 

 According to Ms. Taylor, this entire encounter took place within approximately 15 minutes. Afterwards, she asked Rico to exit the house first so the neighbors would not see them together. Immediately after Rico left the house, Ms. Taylor saw the defendant charging at her. The victim recalled feeling pain and falling to the floor. She testified that she kicked the defendant and stuck him with a piece of glass before he grabbed her purse and jumped out of the window. The victim’s injuries were so substantial she was unable to stand and had to slide herself across the floor and out the door in order to scream for help. The police arrived at the scene soon after, and the victim was taken to receive medical treatment.
 

 The defendant was later found at a friend’s house where he voluntarily surrendered. Upon examination, he was found to have lacerations on his hand and thigh.
 

 The defendant was charged by bill of information with the attempted second degree murder of Carolyn Taylor. The jury returned a unanimous verdict of guilty as charged. The state filed an habitual offender bill of information charging the defendant as a second felony habitual offender, of which he was subsequently adjudicated. The defendant was sentenced on April 23, 2009, to the maximum sentence of 100 years at hard labor, to run consecutively with the remainder of his sentence for forcible rape for which he had recently been released on parole. The defendant now appeals alleging that the evidence does not support the crime of conviction.
 

 | .DISCUSSION
 

 The defendant contends that his offense was actually attempted manslaughter committed in sudden passion or heat of
 
 *905
 
 blood caused by provocation sufficient to deprive an average person of his self-control and cool reflection. He therefore contends that the jury verdict of attempted second degree murder cannot stand, and the lesser offense of attempted manslaughter should be substituted.
 

 As the state observes, the defendant’s assignment of error is essentially a sufficiency of evidence claim that the evidence was not sufficient to convict of attempted second degree murder in light of the mitigating factors indicating manslaughter. The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 443 U.S. 807, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979);
 
 State v. Tate,
 
 2001-1658 (La.5/20/03), 851 So.2d 921, cert.
 
 denied,
 
 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004);
 
 State v. Carter,
 
 42,894 (La.App. 2 Cir. 1/9/08), 974 So.2d 181,
 
 writ denied,
 
 2008-0499 (La.11/14/08), 996 So.2d 1086. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder.
 
 State v. Pigford,
 
 2005-0477 (La.2/22/06), 922 So.2d 517;
 
 State v. Robertson,
 
 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses |4or reweigh evidence.
 
 State v. Smith,
 
 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part.
 
 State v. Hill,
 
 42,025 (La.App. 2 Cir. 5/9/07), 956 So.2d 758,
 
 writ denied,
 
 2007-1209 (La.12/14/07), 970 So.2d 529.
 

 Second degree murder is defined, in pertinent part, as “the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm.” La. R.S. 14:30.1 A.
 

 Manslaughter is defined, in relevant part, as a “homicide which would be first or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection.” La. R.S. 14:31 A(1);
 
 State v. Quiambao,
 
 36,587 (La.App. 2 Cir. 12/11/02), 833 So.2d 1103,
 
 writ denied,
 
 03-0477 (La.5/16/03), 843 So.2d 1130. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed. La. R.S. 14:31 A(1).
 

 Finally, La. R.S. 14:27, which defines “attempt,” reads in pertinent part:
 

 A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
 

 [,-)B. Mere preparation to commit a crime shall not be sufficient to constitute an attempt; but lying in wait with a dangerous weapon with the intent to commit a crime, or searching for the intended victim with a dangerous weapon with the intent to commit a crime, shall be sufficient to constitute an attempt to commit the offense intended.
 

 Thus, in order to convict for attempted second degree murder, the state must prove beyond a reasonable doubt that the defendant had the specific intent to kill.
 
 State v. Bishop,
 
 2001-2548
 
 *906
 
 (La.1/14/03), 835 So.2d 434, citing
 
 State v. Huizar,
 
 414 So.2d 741 (La.1982). Proof of specific intent to inflict great bodily harm is insufficient.
 
 State v. Martin,
 
 92-811 (La.App. 5 Cir. 5/31/94), 638 So.2d 411. Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. La. R.S. 14:10(1);
 
 State v. Bishop, supra,
 
 citing
 
 State v. Butler,
 
 322 So.2d 189 (La.1975), and
 
 State v. Martin, supra.
 

 The law is clear that although specific intent to kill is not necessary for a conviction of manslaughter; however, specific intent to kill is required for a conviction of attempted manslaughter.
 
 State v. Hutcherson,
 
 34,540 (La.App. 2 Cir. 4/4/01), 785 So.2d 140, 147;
 
 State v. Jones,
 
 43,963 (La.App. 2 Cir. 2/25/09), 4 So.3d 950.
 

 “Sudden passion” and “heat of blood” are not elements of the offense of manslaughter; rather, they are mitigatory factors in the nature of a defense which exhibits a degree of culpability less than that present when the homicide is committed without them.
 
 State v. Lombard,
 
 486 So.2d 106 (La.1986). A defendant is required to prove by a preponderance of the evidence that he acted in “sudden passion” or “heat of blood” for a verdict of manslaughter to be appropriate.
 
 State v. Robinson,
 
 32,794 (La.App. 2 Cir. 3/01/00), 754 So.2d 311,
 
 writ denied,
 
 00-0989 (La.3/23/01), 787 So.2d 1008.
 

 In reviewing a defendant’s claim that he met that burden, the appellate court must determine whether a rational trier of fact, upon reviewing the evidence in the light most favorable to the prosecution, could have found that these mitigating factors had not been established by a preponderance of the evidence.
 
 State v. Robinson, supra: State v. Lewis,
 
 28,973 (La.App. 2 Cir. 12/11/96), 685 So.2d 1130,
 
 writ denied,
 
 97-0122 (La.5/16/97), 693 So.2d 797.
 

 The defendant claims that this was not a premeditated crime. He argues that he acted in “sudden passion or the heat of blood” because he was devastated when he saw the woman he wanted a relationship with having sex with another man. The defendant further contends that because no more than 15 minutes had passed between the time the defendant saw the victim and Rico go into the house, and then attacked the victim, there was no time for cool reflection. Finally, the defendant argues that the provocation of seeing the victim with another man was sufficient to deprive an average person of self-control and cool reflection. Accordingly, he argues, a rational trier of fact, upon a preponderance of the evidence, would have found the defendant guilty only of attempted manslaughter, which is the lesser responsive verdict for attempted second degree murder.
 

 We have reviewed the entire record, including the trial transcript summarized as follows:
 

 17Offleer B.R. Johnson of the Shreveport Police Department (“SPD”) testified that he was the first police officer at the scene of the crime. He stated that when he approached the victim, she raised her head and blood gushed from her throat from a severe neck wound. He said that the victim mentioned the name “Mickey” to him. After the paramedics took her to the hospital, Officer Johnson investigated the scene. He stated that there was a significant amount of blood in the house where the crime occurred.
 

 Corporal Freddie Clinton of the SPD arrived next. He observed the lacerations on the victim. He testified that blood was gushing from the cut on her throat. Corporal Clinton learned that “Mickey” was the street name of the defendant, Jessie James Williams. He learned the defendant’s address and went there with K-9
 
 *907
 
 units. The defendant’s mother told him that the defendant had just left, but told the officers of his probable location.
 

 Corporal Skylar VanZandt, a crime scene investigator for the SPD, investigated the crime scene and identified the photographs taken of the house and the crime scene within. These photos showed the presence of broken glass and the victim’s blood on the floor and walls of the house.
 

 Corporal Dan Sawyer of the SPD testified that he accompanied Corporal Clinton to the defendant’s residence, where his mother told them that the defendant might be at a house on Linwood and 84th Street and driving a Blue Chevy Lumina. They went to the house and the defendant surrendered. Corporal Sawyer identified the defendant in open court as the man he arrested.
 

 | ^Corporal Michael Armstrong of the SPD Crime Investigation Unit, visited Ms. Taylor at the hospital two or three days after the incident and took photographs of her injui'ies sustained as a result of the attack. At trial, Corporal Armstrong identified the photographs of the jury.
 

 Detective James E. Croner of the SPD, Violent Crimes, Homicide Unit, investigated the crime. He testified that the victim positively identified the defendant, Jessie James Williams, in a photo lineup consisting of six individuals, including the defendant, all of whom had similar facial features and hair styles.
 

 Melvin Lee Pikes of San Antonio, Texas, testified that he attended a barbeque on the day of the attack. He identified “Mickey” as the defendant, whom he had met a few days prior to the barbeque. Pikes’ mother is Carolyn Taylor. He stated that his mother sent him to get some food from another house. When he returned, he saw Williams sitting outside the house. He went in the house and his mother stated that she was going to get some barbeque sauce and left. Approximately 15 minutes later, the police arrived. He went outside and saw the ambulance and police.
 

 Carolyn Taylor testified that she has lived in Shreveport for almost two years. Ms. Taylor admitted that she smoked crack in the past and was convicted of prostitution about a year prior to trial. She testified that the defendant, whom she had known for a month and a half, was at the party, but she was not talking to him. She said that their relationship consisted of them “just smoking” — presumably crack — and sex. She said that Williams wanted a romantic relationship but she did not. She said that she was trying |9to get away from the defendant. She identified the defendant as her assailant.
 

 Describing the attack, Ms. Taylor stated that she left the barbeque with Rico, a friend of her nephew, to have sex in an abandoned house down the street. After-wards, she asked Rico to leave ahead of her. After Rico left, the defendant charged toward her wearing no pants. She said she felt pain, “slicing,” and she fell to the floor. She grabbed a piece of glass and slashed at the defendant, striking what she believed was his thigh. She said Williams jumped out the window with her purse. When the police arrived, she told the officer that “Mickey did it.”
 

 On cross-examination, Ms. Taylor admitted that she had called the defendant that day, and that he had brought her a ham sandwich. She denied that he also brought her a watermelon.
 

 With this evidence, the state rested, and the defense introduced no witnesses or evidence.
 

 The trial record thus indicates that the defendant actually produced no direct mitigating evidence to indicate that he committed the offense in sudden passion or heat
 
 *908
 
 of blood immediately caused by a provocation sufficient to deprive an average person of his self-control and cool reflection. The testimony of record shows that, at the victim’s request, the defendant brought her a ham sandwich; she nevertheless perhaps ignored him at the barbeque. Then she slipped away with her nephew’s friend to ply her trade, a profession of which the defendant was surely aware. He followed them to the abandoned house and perhaps even witnessed the swift | ^transaction from the shadows of an adjoining room. Afterwards, he attacked the victim with a shard of broken glass, slicing her throat and other parts of her body.
 

 “Sudden passion” and “heat of blood” are simply metaphors for a mental state of uncontrollable rage caused by the circumstances presented to the offender. The standard is objective; that is, the circumstances must be such that
 
 an average person
 
 would lose his self-control or cool reflection. This standard therefore reflects how an ordinary person would react to the same circumstances.
 

 We do not believe that an average person faced with the same circumstances as those presented to the defendant would be overcome by such sudden passion and heat of blood so as to lose all self-control and attack with the intent to kill the victim. On the contrary, the facts of this case indicate that Williams followed Ms. Taylor and her “friend” to the nearby abandoned house. Having known Ms. Taylor for six weeks and her means of livelihood, Williams surely knew what was going on, and, in fact, he argues in his brief that he followed the couple to the house and he witnessed the couple engage in sex. He waited for Rico to leave before attacking Ms. Taylor. While the defendant may have been angry, even furious, at the victim over being rebuffed, an average person does not react to such circumstances by losing all control and attempting murder. Our review of analogous cases supports our view that such circumstances do not constitute sufficient provocation to reduce murder charges to manslaughter.
 
 State v. Triggs,
 
 44,178 (La.App. 2 Cir. 7/1/09), 16 So.3d 482, citing
 
 State
 
 v.
 
 Quinn,
 
 526 So.2d 322 (La.App. 4 Cir.1988),
 
 writ denied,
 
 538 So.2d 586 (La.1989);
 
 State v. Thorne,
 
 93-859 (La.App. 5 Cir. 2/23/94), 633 So.2d 773;
 
 State v. Hamilton,
 
 99-523 (La.App. 3 Cir. 11/3/99), 747 So.2d 164.
 

 On the other hand, the evidence was sufficient in the instant case to convict the defendant of attempted second degree murder. The wound inflicted to Ms. Taylor’s neck was severe, life-threatening, and exhibited an intent to kill. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that the defendant had the specific intent to kill the victim when he slashed her throat with a shard of glass.
 

 There is no evidence that there was any provocation which would have caused the defendant to act in “sudden passion or heat of blood.” The only evidence the defendant offers as provocation is that he desired a romantic relationship from the victim and became jealous when he saw her with another man. However, the evidence established that the defendant only knew the victim for about a month and a half, that she had made it clear upon meeting him that she did not want a relationship with him, and that she was a prostitute. An average person would not be deprived of self-control and cool reflection upon finding out that a prostitute was having sexual encounters with other men. Even if the events could be characterized as provocation, there was ample time for the defendant’s blood to cool in the period of time that the defendant followed the victim and Rico into the house, waited for
 
 *909
 
 them to finish having sex, waited for Rico to leave, and 112then attacked. The mere fact that the defendant was able to keep calm while waiting for Rico to finish having sex with the victim and then leave the house is substantial evidence that he was not acting in “sudden passion or heat of blood.”
 

 Therefore, viewing the evidence in the light most favorable to the prosecution, the jury could have reasonably found that the defendant failed to prove by a preponderance of the evidence the mitigatory factors of “sudden passion or heat of blood” which are required for a conviction of attempted manslaughter. Accordingly, the jury’s verdict of attempted second degree murder is affirmed.
 

 CONCLUSION
 

 For the foregoing reasons, the defendant’s conviction and sentence are affirmed.
 

 CONVICTION AND SENTENCE AFFIRMED.